NEW-YORK,
May, 1832.

Orange County Bank
v.
Brown.

### ORANGE COUNTY BANK *vs.* A. BROWN and others.

A *common carrier* who carries *passengers* and their *baggage* is responsible for the baggage if lost, although no distinct price be paid for its transportation ; the compensation for its conveyance, in contemplation of law, is included in the *fare* of the passenger.

Where, however, the baggage consists of an ordinary travelling trunk, in which there is a *large sum of money*, such money is not considered as included under the term *baggage*, so as to render the carrier responsible for it. It seems, however, that he would be liable for money in the trunk, not exceeding an amount ordinarily carried for travelling expenses.

THIS was an action on the *case*, tried at the Orange circuit in April, 1830, before the Hon. JAMES EMOTT, then one of the circuit judges.

The suit was brought against the defendants as the owners of a steam-boat called the Constellation, for the loss of a trunk belonging to a passenger on board the boat, who was the agent of the plaintiffs and entrusted with the carriage of $11,250 from the city of New-York to the banking house of the plaintiffs, in the village of Goshen. The declaration contained a count reciting that the defendants, on the 15th November, 1827, were the owners or proprietors of a steam-boat called the Constellation, navigated on the Hudson river, between the cities of New-York and Albany, for the carriage, conveyance and transportation of passengers and their baggage and effects, for hire and reward, commonly called passage money; touching upon the passage from New-York to Albany at the village of Newburgh, for the purpose of landing passengers and their baggage or effects ; that on the said 15th day of November, in the year, &c. one *William Phillips*, as the agent of the plaintiffs, at the special instance and request of the defendants, delivered to R. G. Cruttenden, then being master of the Constellation, the trunk or baggage of him the said William Phillips, containing divers goods and chattels of them the plaintiffs, to wit, bank notes amounting in the aggregate to the sum of $11,250, to be safely and securely carried and conveyed in the said vessel from the city of New-York to the village of Newburgh, for hire and reward then and there paid to Crut-

NEW-YORK,
May, 1832.

Orange Coun-
ty Bank
v.
Brown.

tenden as such master of the boat and agent of the defend-
ants, in that behalf. It is then averred that although the ves-
sel on the same day arrived at Newburgh, yet that the de-
fendants and their agent not regarding their duty, did not
deliver the said trunk or baggage containing the said bank
notes to the said Phillips, but so negligently, carelessly and
improperly conducting the carriage and conveyance thereof,
that for want of due care in the defendants and their agents,
the trunk containing the bank notes aforesaid was wholly lost
to the plaintiffs, to wit, at, &c. The declaration contained va-
rious other counts. The defendants pleaded the general issue.

On the trial of the cause, William Phillips was sworn as a
witness on the part of the plaintiffs, and testified that in No-
vember, 1827, he went on board the Constellation at the city
of New-York, with the intention of proceeding to Newburgh,
that on the wharf near the boat he met Cruttenden, the mas-
ter of the boat, and told him that he had *a trunk of importance*
which he wanted to put into the office. Cruttenden answer-
ed, " as soon as we get under way ;" to which he replied that
he wanted it in immediately, as he wished to go ashore. Crut-
tenden then told him to go to the young man or mate. He
accordingly went to the office and spoke to a young man who
appeared to be doing business there, and told him he had a
trunk of importance which he wished to put into the office.
The young man made the same answer as the master : " as
soon as we get under weigh." The witness said he wished to
go ashore, and was then told, " come round to the door, you
may put it there," pointing to a place behind the door. The
witness deposited the trunk in the place pointed out, and went
on shore, and was absent 8 or 10 minutes. While on shore he
bought some oranges, which he held in a handkerchief until
the boat got under way, when he went to the office to put the
oranges into the trunk, and found that it was gone. He im-
mediately apprised the master and the clerk of the fact ;
search was made, but the trunk could not be found. He tes-
tified that there were in his trunk, when he went on board,
*seven sealed packages of bank notes,* received by him from the
first teller of the Bank of America, and which he had been re-
quested by the president of the Bank of Orange County to car-

ry to that bank from the Bank of America. When he
received the packages, the president of the Bank of Orange
County told him that it was his practice when he had
charge of packages of money to carry to Goshen, to deliver
them to the captain of the steam-boat immediately upon
going on board, and advised him to follow the same course,
which he, the witness, considered as a direction to him, and
acted accordingly. On his cross-examination, he said he
did not inform the clerk that his trunk contained bank bills,
nor did he tell Cruttenden, the master of the boat, that it
contained any thing more than his own property; nor did
he tell him that he was going to Newburgh. It was satis-
factorily proved that the packages contained $11,250.

The plaintiffs having rested, the defendants' counsel mov-
ed for a nonsuit on various grounds. The presiding judge
ruled that the liability of the defendants rested on the gen-
eral law respecting carriers; that it admitted of some doubt
whether the risk in this case commenced until the com-
mencement of the voyage; that it was matter of doubt
whether the defendants, in the case of mere baggage, were
insurers for more than the property of the passenger; in
most cases it would be a risk without compensation, which
was not in the spirit of the law; that when a carrier is
to be made liable for bank bills, not made up in a pack-
age pointing to its contents, common justice required that
he should be informed of the nature of his charge, so
that he might take the necessary precautions for the safety
of the bills and for his own protection; that in his opinion
the information of *Phillips* to the master of the boat of
the value and contents of the trunk, was not, under all the
circumstances of the case, sufficient to entitle the plaintiffs
to recover, and on that ground he directed a nonsuit. A
nonsuit was accordingly entered, which the plaintiffs now
move to set aside.

The motion to set aside the nonsuit and for a new trial
was argued by *J. L. Wendell* and *J. R. Van Duzer*, for the
plaintiffs, and by *B. F. Butler* and *M. T. Reynolds*, for the
defendants.

NEW-YORK,
May, 1832.

Orange Coun-
ty Bank
v.
Brown.

*Arguments for the plaintiffs :*

The question presented in this case is interesting and important, not only as it regards the amount in controversy, but as it respects the rights of the public, and the duties and obligations of a very useful and respectable portion of the community, who by their enterprise and capital afford the facilities enjoyed in this country for transportation of passengers and their baggage. Notwithstanding we have no judicial decision in this state on this very question, it is supposed that the principles of law applicable to this case are perfectly settled, and must result in a decision in favor of the plaintiffs. In *England* no one doubts the liability of a *stage coachman* who usually carries the baggage of passengers, for the loss of such baggage, unless he has given notice that he will not be liable beyond a certain amount. He is a *common carrier,* and *within the custom,* and liable to the full extent of the value of goods entrusted to him in the ordinary course of his business, unless he has given notice, limiting his responsibility. To guard against responsibility to the full value of the goods, and to secure something like an indemnity for the risk he incurs, he gives notice to the public that he will not be liable beyond a certain amount, usually £5, unless a *premium* is paid him for the insurance of the goods against loss. Without such notice the carrier in England is liable, and the wonder is, that we should have gone on thus long, in this busy and commercial country, where property to a vast amount is daily transported in our public vehicles without the adoption of a similar precaution by our common carriers; for the law here is the same as in England, and there, as here, he who *carries goods generally,* for all persons indifferently, is a common carrier, and answerable the loss of all property entrusted to him, except in the two excepted cases of inevitable accident and loss occasioned by the enemies of the state. The plaintiffs claim to recover for for the loss of a *trunk* of a *passenger,* who, as the agent of the plaintiffs, had in that trunk a large sum of money belonging to them ; and they claim to recover upon a principle different from that on which the defendants were sought to be charged in the case of *Allens* v. *Sewall and others,* 2 *Wendell,* 340, and 6 *id.* 349, *S. C.* There the defendants were sought to be

charged as the *carriers* of a *package of bank bills*, the same as of a case of silk or bale of goods, or any other article of merchandize. The court for the correction of errors held they were not liable, because they were not carriers of packages of bank bills, that not being within the scope of their ordinary business. Here it is contended the defendants are liable, because it is within the scope of their ordinary business to carry the trunks of passengers. If it be said that this cannot be so, because the result will be the same, that in this way the owners of steam-boats may be rendered liable for the carriage of money, when in the case of *Allens and Sewall* it was decided that they should not be liable, it is answered, that though the result may be the same, the reason of the thing and the law of the case are very different. In the one case the defendants were sought to be charged for the carriage of a package of bills, which was not within the scope of their business, and where the compensation they would receive would be totally inadequate to the risk incurred; in the other they are liable, because to carry the trunks of passengers is within the scope of their business and their ordinary employment, and they receive a full and adequate compensation in the profits of a lucrative business, which could not be prosecuted were not this accommodation afforded to passengers.

For the purpose of distinctly presenting the question arising in this case, it will be assumed that Phillips, the *agent* of the plaintiffs, was a *passenger* on board the Constellation, and had entrusted his trunk, containing the property of the plaintiffs, to the defendants, by delivering it to one of their agents. Although there has been no decision in our courts in a case precisely like this, the principles of law which must control its decision are as well established as any in our system of jurisprudence. In England the law is perfectly settled that the owner of a stage coach is liable for the baggage of the passenger, although no distinct price be paid for the baggage, and such, it is contended, is the law here. If the owner of a stage coach is liable, then is the owner of a steam-boat, which, in the improvements of the age, has been introduced as a substitute for the stage coach almost wherever there are navigable rivers.

NEW-YORK,
May, 1832.

Orange Coun-
ty Bank
v.
Brown.

We then lay down this broad proposition, and respectfully in-sist that it is the law of the land, " Whenever a person en-trusts his property to another, not in virtue of any *special agreement*, but by reason of the *public employment* of each other, who receives it in the ordinary course of his business, the person thus entrusted with the property is answerable for its loss, however occasioned, unless it happen by inevi-table accident, or is occasioned by the enemies of the state." Upon this principle rests the liability of inn-keepers, carriers by land and water, and all others to whom property is en-trusted by reason of their *public employment;* and tested by this principle it is hoped no doubt can exist as to the plaintiff's right to recover. Take the familiar case of the inn-keeper: Who doubts his liability to answer for the lost trunk of his *guest*, let the value be what it may ? He re-ceives no distinct price for the care of the baggage of his guest; his compensation is included in the fare of the guest. This may be very disproportionate to the risk he incurs : for the profit of a night's lodging afforded the traveller, he may be subjected to the payment of $1000. Still he is held re-sponsible. Why so ? Because public policy and public con-venience require it should be so. He, by his *public employ-ment*, has induced the public to entrust their property to his care. Travellers, who are numerous in a rich and commer-cial country, are obliged to rely almost implicitly on the good faith of inn-keepers; and it would be next to impossible, in any given case, to make out proof of *fraud* or *negligence* in the landlord. Therefore it is that the inn-keeper is held respon-sible ; and he cannot complain; *his employment is voluntary,* and the risk, though it seems disproportionate in a given case, is in fact but small, if he is honest himself and employs hon-est and diligent servants. The situation of the *steam-boat own-er* is precisely the same as that of the inn-keeper. In conse-quence of his *public employment*, and not by virtue of any *spe-cial agreement*, property is entrusted to him. He invites the public to bring their baggage on board, by receiving it without inquiry, and providing a place for its deposit; like the inn-keep-er, he receives no distinct price for the baggage, his compen-sation for taking care of and transporting it is included in the *fare* of the passenger. The compensation he receives may be

greatly disproportionate to the risk he incurs, but not great-
er than that of the inn-keeper; but with him, as with the
inn-keeper, the traveller is obliged to rely on his good faith,
and it would be almost impossible to make out proof of fraud
or negligence. The relation which he sustains to the public
is precisely the same as that of the inn-keeper, and the same
broad principles of policy and convenience which render
the inn-keeper liable apply with equal force to him. But
there is another principle which applies to the steam-boat
owner which does not attach to the inn-keeper; he is liable
as a *common carrier* for all goods which are entrusted to
him, and which in the ordinary course of his business he
carries. Who are common carriers? They are those who
undertake to carrying goods generally, and for all people
indifferently, for a stipulated or implied reward. Do steam-
boats carry goods generally and for all people indifferently?
Is it not notorious that they do so? Do they not carry the
baggage of passengers, and have they not express accom-
modations for the purpose? Do they not carry baggage
to a vast extent and to an immense amount? Do they
not do so for all people indifferently, and in the ordinary
course of their business? Is not baggage goods? As to their
hire or reward, it necessarily results from their employment.
If a special agreement is made as to the compensation, they
have a right to demand it; and if no agreement is made,
the law gives them their *quantum meruit.* In relation to
the steam-boats on our river, the compensation is included
in the fare of the passenger, and but that such is the ordin-
ary course of the business, and that no distinct price is paid
for the baggage, nothing could prevent a recovery for a *quan-
tum meruit.* No special agreement being made as to the bag-
gage, the law necessarily must define the rights and obliga-
tions of the parties. What relation, then, does the law cre-
ate between the parties? It is answered, that of *owner of
the property* on the one hand, and *common carrier* on the
other. By the property being placed in the custody of the
steam-boat owner or his agent, a *bailment* is created; and
by ascertaining the species of bailment, which the law in
such case will adjudge to exist, much progress will be made
in ascertaining the rights and obligations of the parties.

NEW-YORK,
May, 1832.

Orange Coun-
ty Bank
v.
Brown.

NEW-YORK,
May, 1832.

Orange Coun-
ty Bank
v.
Brown.

There are five kinds of bailments, *three* of which only are applicable to a case of this kind, viz. 1. *Depositum*, or a naked deposit without reward ; 2. *Mandatum*, which is an undertaking without recompense to do some act for another in respect to the thing bailed ; and 3. *Locatum*, or delivering goods to a public carrier or private person, to be carried from one place to another for a stipulated or implied rewàrd. Neither of the two first species of bailment can be said to exist in this case, because they can be created only by *special agreement ;* for the law never will imply such agreement, because a *depositary* or *mandatary* is liable only for gross neglect in relation to goods entrusted to him. Where personal trust and confidence is reposed, such bailments may be created by the agreement of parties, but the law never will imply such agreement between passengers and the agents of a steam-boat, who may be utter strangers to each other. Who would be so mad as to rely upon the prudence and discretion of a person, of whom he knew nothing, for the care of his property, and with a full consciousness that he could call him to account only for gross neglect ? It has been said that where no distinct price is paid for the carriage of baggage, the carrier takes charge of it and transports it *for the accommodation of the passenger.* This, it will be observed, brings the carrier within the definition of the two lowest species of bailment, viz. *a naked deposit without reward,* and *an undertaking without recompense to do some act for another in respect to the thing bailed.* Now, if such bailment cannot exist without express agreement, the steam-boat owner is not warranted in taking this position ; for, to constitute a contract, there must be the assent of both parties ; and as the owner of the property has not agreed that the steam-boat owner shall be liable only for gross neglect, the latter has no right to insist that such is the contract. Again, these are bailments without recompense. Who considers that a favor is done him in the carrying of his baggage, and how can it be said that the steam-boat owner reaps no benefit from the bailment ? What would be the receipts of steam-boats, if they did not carry baggage ? It is insisted, therefore, that instead of viewing him as a mere depositary or madatary, the law adjudges the owner of a steam-boat, who, in the ordinary course

NEW-YORK,
May, 1832.

Orange County Bank
v.
Brown.

of his business, carries the baggage of passengers, *a common carrier;* and if so, he is liable to all the duties and obligations incident to that character. Even should the defendants in this case be considered merely in the character of *depositaries* or *mandataries,* we would insist that they are responsible to the plaintiffs, on the ground that they spontaneously and officiously proposed to carry baggage, by holding out that inducement to passengers and charging nothing for the carriage ; the rule of law in such case being, " that if a depositary or mandatary spontaneously and officiously propose to keep the goods of another, or to do an act for another, and does it amiss, he is answerable for slight as well as gross neglect."

It has been said that " a stage coachman is not liable as a common carrier, unless he takes a distinct and fixed price for the carriage of goods, as well as persons." From this proposition, it would seem that the character of the common carrier *depended upon his receiving hire* for the carriage of goods. But this is not so. Although a person undertakes the carriage of goods, and receives hire for so doing, these facts do not constitute him a common carrier. Something more is necessary ; he must carry goods generally, or in other words, it must be his ordinary business, and he must carry for all persons indifferently ; and unless he does so, he is not a common carrier, and not liable to the duties and obligations appertaining to that character. The carrier for hire in a particular case is bound only to ordinary care and diligence, whereas the common carrier is answerable for all accidents, thefts and robbery ; nothing but inevitable accident or the acts of public enemies will excuse him. A common carrier, like a carrier in a particular case, carries for hire ; but his liability grows not out of the fact of his receiving hire, but out of his public employment. The fact of his receiving hire, therefore, does not determine his character. Tested by these principles, it would seem that the right of the plaintiff to recover was established. If an inn-keeper, who induces the public to entrust their property to his care, is liable, so is a steam-boat owner. If the owner of a steam-boat carries goods generally, and for all people indifferently, he is a common carrier. If a stipulated or implied reward is necessary to render him liable, the law secures him that reward, provid-

NEW-YORK, ed it be not considered as included in the fare of the pas-
May, 1832. senger, according to the established course of business.

Orange Coun-     It will not be denied that there is some confusion on this
ty Bank      subject in the books, but when the cases which are suppos-
v.       ed to establish the principle, " that a stage coachman is not
Brown.     liable as a common carrier, unless he takes a *distinct price
for the carriage of goods*, as well as persons," come to be ex-
amined, and tested by the principles of law applicable to this
action, the apparent confusion will be dissipated. The lead-
ing case on this subject, and which is quoted in all the ele-
mentary works treating of bailments, is *Middleton* v. *Fowler*,
as reported in 1 *Salk.* 282 ; and most probably all the diffi-
culty which exists on this subject has grown out of the im-
perfect manner in which that case is reported in *Salkeld.*
Holt, Ch. J. is there made to say, " that a stage coachman
was not within the custom as a carrier is, unless such as take
a distinct price for carriage of goods as well as persons, as
waggons with coaches ; and though money be given to the
driver, yet that is a gratuity and cannot bring the master
within the custom, because the master is not liable for the
acts of the servant, unless acting within the scope of his au-
thority." Now all that was in fact determined in that case was
the last proposition, viz. that the master is not liable for the
acts of the servant, except while acting within the scope of his
authority, as will be seen by a report of the same case in
*Holt's R.* 130, and *Skinner*, 625. See also *Boucher* v.
*Lawson, Cas. Temp. Hardw.* 85, and *Buller's N. P.* 70.
What is said beyond that point is *obiter*, and what in fact
was *intended to be said* in relation to *a distinct price* for the
carriage of goods was, that a coachman who only carried
passengers, and *did not allow baggage to be carried*, was
liable *only on an express contract when he did carry bag-
gage ;* as will be more fully seen by reference to the report
of the same case in *Holt* and *Skinner*, and in the subse-
quent case of *Upshare* v. *Aidee*, 1 *Comyn's R.* 24. That
was an action against a hackney coachman for the loss of
goods ; and it was held, that as there was no express con-
tract for the carriage of the goods, and as by the custom
and usage of stages, passengers paid for the carriage of
goods above a certain weight, unless they so paid, the coach-

man was not liable. At that early day, *passengers were not allowed to carry baggage beyond a certain weight,* (say 10 or 15 lbs.) for their necessary occasions, as stated in *Middleton* v. *Fowler,* in *Holt & Skin.;* and if they did, it was *privately* and by *stealth,* and the coachman was not liable unless he was paid for the carriage of the goods—a *coachman,* that is, one carrying passengers only, not being within the custom. That case, therefore, only determined that if a passenger is not allowed to carry baggage beyond a certain weight without paying for it, and he does carry such baggage, the coachman is not liable.

The next case relied on, supposed to establish a doctrine different from what the plaintiffs contend for, is *Lovett* v. *Hobbs,* 2 *Show.* 127, which was an action against a coachman *for losing a passenger's box of goods.* *Sir B. Shower,* as counsel for the defendant, insisted that the action lay not, for that a common coachman was but a *new invention,* and not within the common law or custom of England concerning common carriers. But the judge was of opinion, that *if a coachman commonly carry goods and take money for so doing,* he will be *in the same case with a common carrier, and is a carrier for that purpose,* whether the goods are a passenger's or a stranger's. This is the same doctrine advanced in *Holt, Skinner* and *Comyn,* and nothing else. The *counsel* says, the business of a common coachman is a *new employment,* and not *within the custom.* *True,* says the judge, but if he carries goods and takes money for it, *he will be in the same case with a common carrier, and is a carrier for that purpose;* reiterating the doctrine of Ch. J. Holt, that if a *carrier of passengers* also *carries goods* and *takes money for so doing,* he will be liable. It then being the custom and usage of stages for passengers to pay above a certain weight, and if they did not, the carrier was not liable, the judge must be considered to have declared the law in reference to such custom. To this *custom* undoubtedly may be traced the practice introduced of late years in England, of *giving notice* limiting responsibility to £5. These are the only cases which have created any obscurity on this subject; and if the view now presented be correct, they do not conflict with the doctrine for which the plaintiffs contend. They only establish the principle that if baggage beyond a certain weight is not al-

NEW-YORK,
May, 1832.

Orange County Bank
v.
Brown.

lowed to be carried without being paid for, and it is carried and lost, the coachman is not liable, because he was not paid for it. The principle for which we contend is, that if baggage is allowed to be carried, and is carried in the ordinary course of the business of the carrier, and this is done for all persons indifferently, the carrier is a common carrier, and subject to the duties and obligations of a common carrier, and that the hire or reward forms no ingredient in what constitutes the character of a *common carrier*. But a different reading has been given to these cases; and if not, they have been *overruled* by subsequent decisions. In *Robinson* v. *Dunmore, 2 Bos. & Pul. 419,* *Chambre*, J. observes, " It has been determined, that if a man travel in a stage coach and take his *portmanteau* with him, though he has his eye upon the portmanteau, yet the carrier is not absolved from his responsibility, but will be liable if the portmanteau be lost." And in *Clark* v. *Gray, 4 Esp. Ca.* 177, and 6 *East,* 566, in which the question directly arose, *whether a stage coachman was liable for the baggage of a passenger*, it was held by Lord Ellenborough that the case came within the principle that carriers are subject to losses by the general law of the realm, and that the defendant could discharge himself only by notice that he would not be liable beyond a certain value; and the defendant having given notice, the plaintiff had a verdict of only £5. The learned *Erskine* was counsel for the defendant, and it did not occur to *him* to object *that the coachman was not liable unless a distinct price had been paid for the carriage of the goods;* on the contrary, when the case came before the K. B., he expressly admitted that the coachman was liable within the custom, had he not given notice, which he contended should have been specially set forth in the declaration. Mr. Selwyn, in his abridgment of the law of nisi prius, considers these cases as overruling *Upshare* v. *Aidee* and *Middleton* v. *Fowler,* 1 *Wheat. Selwyn,* 304, *n.* 1. Mr. *Jeremy*, in his treatise on the law of carriers, p. 12, seems to question this conclusion of Mr. Selwyn, and in support of the old cases, suggests " that *allowing baggage* at all is more *for the accommodation* of the passenger than a *direct object* of profit to the owner." It is worthy of remark that he speaks of *allowing baggage*, evidently alluding to the principle of the old cases, when passengers were *not allowed*

to carry baggage. So it is also worthy of remark, that he speaks of a *direct object of profit*. If *indirect*, it is the same thing as if *direct*. What cannot be done *directly*, is not allowed to be done *indirectly*; and the reverse is equally true. But the conclusive answer to Mr. Jeremy's suggestion is, that if he places the carriage merely *on the ground of accommodation to the passenger*, the species of bailment he creates is that of a *mandatary*, whose liability does not extend beyond *gross neglect*, except in certain cases, and in which bailment cannot exist but by *special agreement*. Besides, he is not supported by the fact; it is not for *the accommodation* of the passenger; it is the *inducement* held out to him, and from it arises the profit of the *carrier*. Mr. *Petersdorf*, in his abridgment, supports Mr. *Selwyn* in his deduction, and impugns the reasoning of Mr. *Jeremy*. 5 *Petersdorf's Abr.* 59, *marg. n.* So also Mr. *Halsted*, in a late edition of *Jones on Bailment, N. Y. ed.* of 1828, *p.* 102, 3, (*a.*) So also Mr. *Leach*, in a note to *Lovett* v. *Hobb*, 2 *Shower*, 127, places the liability of the carrier on his *public employment*, and not on the fact of his *receiving hire*.

A case has been decided in the supreme court of *Louisiana* which in many of its features is like the present. It is that of *Denis, for the heirs of Malpica* v. *McKarn, master and the owner of the ship Belle*, to be found in *Angel's Law Intell. for Feb.* 1831, *p.* 49. Malpica came on board the ship Belle at Vera Cruz, as a passenger to the Havana, and brought on board with him a sum of money of the amount of upwards of $7000. No freight was paid for it, nor any notice given to the captain that it formed part of his effects. After the vessel was out a few days, Malpica died, and this action was brought for the recovery of the money. The judge who delivered the opinion of the court, remarks : "Our attention has been most turned to that part of the defence which claims immunity for the captain in consequence of the passenger bringing money on hoard without giving notice of it. We have endeavored, but fruitlessly, to satisfy ourselves whether the master and owner are resonsible for money or precious objects placed among the baggage of a passenger, and of which no particular declaration is made,

The *Consulado del Mare* and *the laws of Ursby* both treat of the effects of this concealment on a claim for *average*, if the objects have been thrown overboard; but they are silent as to the responsibility of the captain in other cases. A law of the *Partidas* renders the owners responsible for every thing brought on board with the knowledge of the master; but whether the delivery of a trunk or parcel without a declaration of its contents would produce responsibility in the case supposed, the law is silent. *It is probable it would:* no exception is made. And even where the traveller is received through friendship by carriers on land and water, or keepers of inns, this law makes them responsible for his effects, unless they receive him with an express declaration that the traveller must take care of his own property."

As to the liability of the defendants, being common carriers, whether informed of the contents of the trunk or not, it is supposed there can be no question; the law both in England and here being, that its value is immaterial, provided there be no fraud or fraudulent concealment, and that a party is not bound to state more than what was said here, to wit, that the trunk was *valuable,* to induce greater care and diligence. But we have a case in our own courts, which, it is conceived, contains a principle decisive in favor of the plaintiffs, and goes far beyond what is asked here. It is *Kemp* v. *Coughtry,* 11 *Johns. R.* 107. In that case the defendants took 156 barrels of flour from Coeymans to New-York to be sold, *and ordinary freight to be paid.* The usual course of business was to sell and bring back proceeds without charging commissions. The captain was robbed, and the owners were sued for the money. The court say: "Although no commission or distinct compensation was to be received upon the money, yet, according to the evidence, it appears to be a part of the duty attached to the employment, and in the usual and ordinary course of business, to bring back the money when the cargo is sold for cash. The freight of the cargo is the compensation for the whole; it is one entire concern. So here; it is part of the duty attached to the employment, to take charge of baggage. The passage money is the compensation for the whole; it is one entire concern.

NEW-YORK,
May, 1832.

Orange County Bank
v.
Brown.

There is another view in which this cause may be presented to the consideration of the court : If the *bailment* in this case should be considered that of *mandatum*, an undertaking to carry without recompense, the defendants are liable beyond gross neglect, that is, for slight neglect under the circumstances of this case. It is a principle of law under this head of bailment, that the bailee is responsible even for slight neglect, if he spontaneously and officiously offers to do the act, in the doing of which damage ensues. *Jones on bailment*, 41, 48, 94. And it is submitted that the defendants here should be considered as having placed themselves in that situation by *a place for baggage on board their boat, receiving it and charging nothing as a distinct price for its carriage*. If there was slight neglect, they are liable ; and whether there was negligence or not, was a question of fact for the jury to decide. 6 *Johns. R.* 160. 10 *id*. 1. The principal inducement which seems to have operated on the mind of the judge in granting the nonsuit, seems to have been that the agent of the plaintiffs had not given sufficient information of the contents of the trunk and its value. With due deference, it is supposed that the judge in so ruling applied a principle of law to this case not belonging to it. Information of the value of baggage never can be necessary to be communicated to the carrier, unless a higher price is exacted for the transportation of money or other valuables than for ordinary goods. If, for instance, *three pence in the pound* was exacted for transportation, as in the case of *Gibbon* v. *Paynton and another*, 4 *Burr.* 2298, or *one half per cent.*, as in the case of *Tyly and others* v. *Morris, Carthew*, 485, common justice dictates that the carrier should not be liable, unless true information was given. But where no *extra price* is paid for the carriage of valuables, there is no reason or propriety that the carrier should be discharged simply because not informed of the value of the articles. On the contrary, public policy and convenience demand that no such information should be required ; it would unnecessarily expose property, and create temptations which otherwise would not exist. A *tavern keeper* is not discharged because not informed of the value of the property entrusted to him ; and why ? because it is immaterial to him ; his charges would not

be increased in consequence of it.  And so it is with the *owners of steamboats;* it affects not their charges.  The observation that it is *the reward that makes the carrier liable* is correct, therefore, only where *a greater price is paid;* for, as a general principle, it is not true that it is *the reward that makes the carrier liable;* for a private carrier, receiving a reward, would not be answerable as a *common carrier;* he would be holden only for ordinary care and diligence.  The rule upon this subject is laid down in *Fitchburne* v. *White,* 1 *Strange,* 145, where Ch. J. King says: "If a box is delivered *generally* to a carrier and he accepts it, he is answerable, though the party did not tell him there is money in it;" and in a note to that case, the true distinction is stated thus: "But where the price of the carriage of money is greater than that of other goods, and the carrier is paid only as for common goods, and is ignorant that the parcel contains money, he shall not be answerable." But allowing information of value to be necessary, so far as to induce care and caution, enough was said and done in this case to put the defendants or their agents on their guard: they were told it was a trunk of importance, and great solicitude was shewn by the agent of the plaintiffs to have it safely deposited.  In the case of *Sewall* v. *Allen,* this court, 2 *Wendell,* 340, and in the same case, 6 *id.* 349, the chancellor held that there was no pretence of an improper concealment, the party there being told that the package *was a valuable one.* So in the case of 1 *Pickering,* 50, the expression was nearly the same, and held enough.

### Arguments for the defendants:

Admitting that the defendants were common carries, as to the trunks and baggage of passengers travelling in their boat, and subject to all the duties and responsibilities appertaining to that character, it being within the scope of their ordinary business to carry such trunks and baggage, although no distinct price was paid for the carriage of the same; and that the law as laid down in *Middleton* v. *Fowler,* reported in *Salkeld,* had been overruled in the subsequent cases cited on the other side, the defendants' counsel insisted that the principle that the carrier is liable only in respect to his reward, had not been

overruled, and they therefore contended that the nonsuit was

properly directed for the reason assigned by the judge, viz. that the bank bills not being made up in a package, pointing to its contents, the carrier ought to have been informed of the fact that the trunk contained such bills, and that the information given in this case was not sufficient for that purpose. In arguing this point, the counsel said they would lay out of view every thing relating to the character of the defendants' business, and the authority of their agent, the circumstances under which the money was received into the boat, and the form of the action, and would treat the case as if the money had belonged to *Phillips*, and as if the suit had been in his name. The first question then was, whether a passenger going on board a steam-boat at *New-York* with an ordinary travelling trunk, with the intent of proceeding to *Newburgh*, and having in his trunk a package of bank notes to the amount of $11,000, is or is not bound to inform the officer of the boat that it contains *bank notes?* The judge thought that he was. The counsel for the plaintiffs had undertaken to shew that he was not, and had cited many cases in support of the position for which they contended; the cases, however, were decided since the revolution, and were not very uniform and satisfactory; in some, the law of common carriers being enforced with the utmost rigidity, whilst in others, the carrier is treated with much favor. Since the revolution, the practice of *giving notices* has been universally adopted by carriers in England, and although at first objected to as an improper innovation, has become a part of the law of common carriers. These notices usually are, that the carrier will not be responsible for goods over £5, unless notified, or notified and paid accordingly. From the cases on this subject, and particularly those before the revolution, they said the following rules were deducible : 1. That where the trunk, package or box is made up in such a way, or delivered under such circumstances, as to indicate that it contains money or other valuables, then the carrier is responsible, even though he is not told that there is money in it. 2. And in such case, the owner is not bound to specify the quality or value of the goods, or the amount of money, &c. unless asked. 3. But where the trunk, box or parcel is of such a

nature as not to indicate that its contents are peculiarly valu-
able, as containing money or other valuables, then the carrier
is not responsible, unless he be specially informed.   In appli-
cation of these principles, they observed : the defendants here
are proprietors of a steam-boat kept for the transportation of
passengers and their baggage.  In the usual course of business,
passengers carry with them travelling trunks, containing the
wearing apparel and other necessaries required on a journey,
belonging to the owner.   When a passenger comes on board
with an ordinary travelling trunk, there is nothing to indicate
that there is a large package of money in it.   The agents of
the owners of the boat would not expect such to be the case,
and the fact that no charge is made for  baggage by the own-
ers of steam-boats employed in the transportation of passen-
gers, proves that they do not suppose that there is money in
it, for if they did, they would make a charge.- They have no
right to suppose there is money in the trunk, as that is usually
carried about the person of the traveller, or if it be a large
package, is delivered to the master for safe keeping.   The
carrier, therefore, unless informed that there was money in
the trunk, would only expect it to contain the articles usually
carried in it, i. e. *ordinary wearing apparel,* suitable to the
station in life of the owner.   To make him responsible for the
loss of a large sum of money, he should be expressly inform-
ed that the trunk contains money or something equivalent
thereto.   A different doctrine was held in the case cited by
*Hale* in 1 *Ventriss,* 238, where a box was brought to a carrier
with a great sum of money in it, and upon the carrier de-
manding of the owner what was in it, was answered that it
was filled *with silks* and such like goods of mean value, upon
which the carrier took it, and was robbed, it was resolved
that he was liable.   In commenting on this case, *Lord Mans-
field* in *Gibbon* v. *Paynton and another,* 4 *Burr.* 2201, said he
would have thought the carrier excused, although he had not
expressly proposed a caution against being answerable for
money, as he had done in that case, for it was artfully conceal-
ed from him that there was any money in the box ; and in
the case then at bar, he held that the warranty and insurance
of the carriers is in respect of the reward he is to receive,
and the reward ought to be proportionable to the risk.   If he

makes a greater warranty and insurance, he will take great-

er care, use more caution, and be at the expense of more guards, or other methods of security; and therefore, he ought in reason and justice to have a greater reward. This case is the best evidence of what was the law previous to the revolution, and contains the principles for which the defendants contend. The notice given in this case was not sufficient to apprise the master of the value of the contents of the trunk. *Phillips* said he had a trunk of importance; this was altogether too vague; it did not point to the value. Had it contained only the wearing apparel of Phillips, it might to him have been a trunk of importance. It would be a trunk of importance to a schoolmaster, if it contained his books; to a lawyer, if his papers and briefs were enclosed in it; and to a mineralogist, if his specimens were deposited in it. If the latter were the contents of the trunk, no danger from thieves was to be apprehended; but had Phillips said a word about *money*, the master would have understood it at once; he would have known that it behoved him to take special care of it, and he would also have known that his owners were entitled to a reward for insuring the money, and he *would* have charged it, or at all events *could* have charged it and have retained the trunk until the reward was paid. Instead of giving such information as would have enabled the master to act understandingly, *Phillips* said just enough to authorize the pretence that he had warned the master of the value, yet not enough to enable him to know the hazard he incurred, so that he might make an *extra* charge, nor to admonish him of the necessity of special care. In *Allen* v. *Sewall*, 2 *Wendell*, 327, the notice was held sufficient, because the carrier was told that the article delivered was a very valuable package, and besides, it appeared to be a package of money. In *Dwight* v. *Brewster*, 1 *Pick.* 50, it was said to be *as valuable as money*, but nothing that was said in this case indicated that there was money in the trunk.

Now admitting that the defendants are liable for the ordinary contents of a trunk, they never can be subjected to liability, where the contents of the trunk is money or other valuables; they are responsible only for the *baggage* of the traveller, such as his clothing and such articles as are commonly car-

ried by travellers. Such is the understanding of both parties. By becoming the carriers of the baggage of the traveller, carriers have no idea of becoming the carriers of money, jewels or the like, as the risk would be entirely disproportionate to the reward, the sole principle of their liability. To hold the defendants in this case responsible for money, when not informed that there was money in the trunk, and when, if informed, they would most probably have refused to receive it, would be unjust in the extreme. In *Brooke* v. *Pickwick*, 4 *Bing*. 218, the principle contended for by the defendants is recognized, viz. that the carrier, in such cases, acts upon the assumption that the trunk of the passenger contains no more than a person in his condition might be expected to carry with him.

*Secondly*, the counsel insisted that there was no proof of any contract, express or implied, to carry the property in question from New-York to Newburgh. They observed, that in this and the next objection they would speak of the action as if it were founded on a *contract*, though in form it was *an action on the case*. So far as related to the right to plead the *non-joinder* of other owners in abatement, it had been decided by this court in this case, (3 *Wendell*, 158,) that this action was founded not on contract, but on a breach of duty by the defendants as carriers. But whether the action be founded on the *breach of contract* or the *breach of duty*, it is in either case necessary that the plaintiffs should prove their case as laid. In the declaration it is alleged that the property was delivered to the agent of the defendants to be carried "from the city of New-York on and by the Hudson river to *Newburgh*," and a breach is accordingly charged. What was thus alleged, the plaintiffs were bound to prove, for it was the foundation of this action. Mr. *Starkie*, in his *Treatise on Evidence, vol.* 2, *part* 4, *p.* 330, says: "Whether the action be founded in *assumpsit* for breach of the defendant's undertaking, or in *tort* for breach of duty, it is necessary to prove, 1. A contract, express or implied; 2. The delivery of the goods; and 3. The defendant's breach of promise or duty." In this part of the proof, the *termini* stated in the declaration are material and must be proved as laid. 2 *Starkie's C.* 385. 12 *East*, 452. 1 *Johns. R.*

96. Upon this subject *Starkie* also lays down this rule: "The true distinction is between such circumstances as can be separated and divided from the principal fact alleged, leaving a sufficient allegation still remaining, and those circumstances which are not divisible from the fact, but so connected with it, that if the circumstances were omitted there would be no allegation of the essential fact itself." 2 *Starkie's Ev. part* 4, *p.* 350. Now in the interview between Phillips and the master, *Newburgh* was not even named, and the intention of Phillips to go there was not made known ; it is impossible, therefore, that a contract can be implied *to* carry the trunk to *Newburgh,* or in the language of the declaration, it cannot be said that the property was delivered to the defendants to be carried to Newburgh; the plaintiffs should have declared that the property was delivered to be carried to such place on the river as Phillips should designate. But if there was proof of a contract, there was none of a *contract with the plaintiffs,* either express or implied. The master was not informed that there was money in the trunk, or that such money belonged to the plaintiffs ; the only contract was to carry the trunk and property of Phillips. He said nothing about the plaintiffs or their property, or that he was their agent ; he appeared in his individual character, and as an ordinary passenger. It probably is not material that the carrier should know *to* whom in particular the property of which he takes charge belongs, to render him liable, provided he knows that he has the property ; for unless he knows that it is committed to him, he is not liable. 1 *Ld. Raym.* 46. Here he did not know that the money was on board, and he therefore could not contract with any one in relation to it. It is no answer to say that he knew the *trunk* was there, and that it was proved that the *money* was in the trunk ; because the trunk was presented as the trunk of Phillips, who did not specify its contents, nor disclose his agency. He spoke of it as *his trunk,* and as a trunk of importance ; but did not say it was important to the plaintiffs or to any one besides himself, and of course the master could only know it as the property of Phillips, and could not presume it to be the property of any one else. This omission to disclose the fact to whom

NEW-YORK,
May, 1832.

Orange County Bank.
v.
Brown.

the property belonged, was material, as it affected the defendants' right to charge and to receive compensation; for we again repeat, the carrier is liable in respect of the reward he is to receive. *Allen* v. *Sewall*, 2 *Wendell*, 327, *and S. C. in* 6 *Wendell*, 349, *opinion of Chancellor Walworth, Senator Oliver*, *p.* 361, *and Senator Tallmadge*, *p.* 364. *Harris* v. *Peckwood*, 2 *Carr. & Payne*, 76. *Riley* v. *Herne*, 2 *Moore & P.* 337. Here nothing was paid, nor intended to be paid for the carriage of the bills ; Phillips only intended to pay for his passage to Newburgh, and in truth did not intend to pay any thing for transporting the trunk and his own property in it, the baggage of a passenger in the steam-boat going free of charge. Nor were the plaintiffs liable to pay any thing for the carriage of the bills ; they were in the trunk, and the trunk constituting Phillips' baggage, the defendants would have been bound on receiving the fare for his passage to deliver the trunk with all its contents to him, and could not have retained it for any thing beyond the fare. Suppose the trunk had arrived in safety at Newburgh and had been delivered to Phillips, and the defendants had afterwards discovered that they had carried bills for the bank, could they have sued the bank for the carriage of the bills? Surely not. The bank had neither expressly nor by implication requested the carriage of the bills, nor had they promised to pay for the same. In an action against the bank it would have been said to the defendants, your business is to carry passengers ; you charge such price as you think reasonable, and for that price you undertake to carry the passenger and his reasonable baggage. Mr. Phillips paid you that price ; your risk extended only to his property, and you have no right to call on us. And it would properly be said so, for otherwise the owners of the boat would have a right to call on every person for freight for whom a passenger might happen to carry an article in his trunk. Can it be pretended that if he had articles in his trunk for twenty individuals, that the owners of the boat had a right of action against each one of them ; and if they are not responsible for the reward of the carrier, the carrier is not liable for the safety of the articles, for it is in respect of the reward that the carrier is liable. But if the plaintiffs were bound

to pay, and if the defendants were entitled to recover pro-vided they had known that the bills belonged to them, it would have made no difference, for it is evident there was no intention to pay; and as the defendants did not know the value of the contents of the trunk, they could not take measures to secure a compensation. This, therefore, was a species of fraud on the defendants, and brings this case with-in the principle of the cases where the carrier is discharged on the ground of fraudulent concealment of the value of the article entrusted to him. Had the master of the boat been told that the trunk contained the money of the plaintiffs, he could have exercised his volition as to taking it, and have se-cured a just indemnity. By the fact not being disclosed he was deprived of the means of deciding whether he would take the money on board, and also of securing a just compen-sation. The only contract was to carry the trunk and prop-erty of Phillips; he was the only person known to the de-fendants, and he only was bound to pay; and all *he* intended to pay was the ordinary fare of a passenger. As to the trunk itself and all the articles in it except the bills, there was clearly no contract with the plaintiffs; the contract was with Phillips; an implied contract to carry him to such place as he should designate. But if there was also a contract with the plaintiffs to carry their bank notes, then out of the mere delivery of this trunk to be carried along with its own-er to Newburgh, there are two contracts: 1. The implied contract with Phillips to carry, &c.; and 2. A contract with the bank to carry that part of the contents of the trunk which belonged to them, when nothing had been said about the bank, nothing paid or intended to be paid for carrying their money, and nothing could be recovered against them. Be-sides, it would be a contract on the part of the defendants, to carry the money of the plaintiffs on a consideration moving from Phillips, not on account of the bank, or at their expense; but on his own account, and at his own expense. Again; Phillips himself was a *carrier*, and the plaintiffs could not re-sort to the defendants for the fulfilment of his contract. The president of the Orange county bank employed him to carry the money from New-York to Goshen. He was entitled to pay for his services; he alone was entitled to a reward, and is

NEW-YORK, liable for the loss; and cannot shift the responsibility from
May, 1832. himself to the defendants, *qui sentit commodum sentire debet*
Orange Coun- *et onus.* *Jeremy on Carriers*, 18 *to* 22. Confiding the goods
ty Bank to a subsidiary carrier does not discharge the original car-
v. rier, nor can a contract be implied with such subsidiary car-
Brown. rier. *Jeremy*, 68. Besides, the suit should have been in the
name of Phillips; he delivered the property to the agent of
the defendants, and was liable to pay the freight, and was
the consignee. If there was any liability to pay for the car-
riage of the bills, it rested on Phillips, and on him alone.
He acted as a principal, and not as the agent of the bank;
he brought the trunk on board, and to him it was to be de-
livered at the termination of the voyage; the defendants
could not dispute his title. 3 *Esp. N. P. Cas.* 115.

The counsel for the defendants further insisted that the
plaintiffs were not entitled to recover, because there was no
proof that the defendants were *carriers of bank bills*, or that
the master of the boat had authority to take and carry bills at
the risk of the defendants. The plaintiffs, with the view, no
doubt, to charge the defendants, gave evidence shewing the
general character and employment of the vessel, that she was
used for the transportation of passengers, and open to all
persons indiscriminately, and that she frequently carried
boxes and other light articles on freight; but no proof
was adduced that the boat had been employed in carrying
bank bills in packages, or in any other form, or that she had
ever been held out as such. Now unless it had been the
usage for the boat to carry bank bills, the master had no
authority to take bills to carry at the risk of the owners;
he was not their agent for the carriage of parcels of bank
bills, or to make contracts in relation to such business;
he was their agent for the purpose of transporting passen-
gers and their baggage, and to carry light freight; and
if he was even authorized to carry bank bills for passen-
gers, he had no authority to carry bills for third persons.
It cannot be said that a steam-boat for the transportation
of passengers and light freight is from necessity to be con-
sidered a boat for the carriage of bank bills; for it does not
follow because a boat carries one kind of commodities it is
therefore open for carrying all kinds, and obliged to do so.

A suit could not have been maintained against the defendants for refusing to carry a package of bank bills. A carrier may limit his responsibility. The duty of carrying may be limited by the nature of the business, or by the will of the owners. It was incumbent upon the plaintiffs, therefore, to shew that the defendants' business included the carrying of bank bills, before an authority can be inferred in the master to receive bills to carry at the risk of the owners. 1 *East*, 604. 6 *Wendell*, 335. No such proof was given, and on the contrary, the evidence tends clearly to shew that the master had no authority to receive bank bills at the risk of his owners. The only branch of business under which they could be received, is that which relates to the carriage of light articles. Those, by the advertisement of the vessel, were to be received at a freight of one shilling per *cubic foot*. This obviously could not have been meant to include bank bills; but if intended to be included, and if bank bills be admitted to be *light freight*, within the meaning of the advertisement, it was at all events intended they should be made up in such form as to be capable of being measured, or in other words, that the master might see the parcel, or be informed of its existence, so as to charge the proper freight; it was not meant that light freight should go free of charge, but on the contrary, that a reward should be received for its carriage. The owners meant that passengers should pay according to a regular fare, and that light freight should be paid for at a certain rate per cubic foot. The master had no authority to take light freight enclosed in a trunk, not known to him, and consequently not liable to charge; so that if the master was authorized to carry bank bills at the risk of the owners, when delivered to him in a package by itself, he was not authorized to carry them in the form in which they were in this case.

The counsel further insisted that the loss of the bills was occasioned by the misconduct of the plaintiffs' agent, first, in not giving proper information of the contents of the trunk and the value thereof, and secondly, in not obeying the instructions of the president of the bank to deliver the packages of bank bills to the master of the boat immediately on going on board. In *Bradley* v. *Waterhouse*, 1 *Moody & Malkin*, 154,

and 3 *Carr. & Payne*, 318, *S. C.*, 200 sovereigns were enclos-
ed in six pounds of *tea*, and lost ; the judge at the circuit sub-
mitted to the jury to consider whether the plaintiff's own con-
duct had not led to the loss, and remarked that the plaintiff
adopted a *disguise* for his parcel, likely to prevent the defend-
ant from taking any particular care of it, and yet not so com-
pletely concealing its nature as to prevent it from being likely
to be selected for depredation by a dishonest servant.   The
jury in that case found for the defendant, and under the
circumstances of this case, the defendants were equally en-
titled to a verdict.   Had the agent followed the directions of
his principals, there would have been no loss ; his omission to
do so was a breach of duty to his employers, and occasioned
the loss.    The plaintiffs cannot now be permitted to visit on
the defendants the negligence and breach of duty of their
agent.   They never trusted the defendants at all with the
care of their property; it was during the whole voyage under
the care of Phillips as their agent.   If the plaintiffs intended
that the packages of bank bills should be carried at the risk of
the owners of the steam-boat, they should have been deliv-
ered directly to the master of the boat, so that he might
have bestowed proper care in their safe keeping, and been
enabled to make a suitable charge for their carriage.   In-
deed, it seems that the plaintiffs intended that the bills should
have been delivered to the master of the boat ; but Phillips
either not understanding, or not choosing to follow the di-
rection he had received, kept the packages in his trunk.   If,
on the other hand, the plaintiffs intended that Phillips should
keep the packages in his trunk, then they reposed no trust
in the owners or master of the boat, and *quoad* the packages
there was no bailment ; and whether the plaintiffs did or did
not intend that Phillips should keep the packages in his
trunk, they in fact were so kept.   The case of *Miles* v. *Cat-
tle and another*, 6 *Bingham*, 743, was in some of its features
like that now under consideration.   The plaintiff took a place
in the defendants' coach from Stockton to York, intending
when at York to proceed by the mail to London.   He had
with him in the coach a bag, labelled "T. Miles, passenger,"
containing clothes worth about £15.   Previously to setting

out from Stockton, one Garbut delivered to him a parcel containing a £50 bank note, addressed to an attorney in London, which parcel Garbut desired the plaintiff to *book* at the defendants' office at Stockton, and forward by the defendants to London. The plaintiff, instead of doing so, put the parcel into his own bag, intending to convey it to London himself. The carriage of the parcel, if it had been sent by the defendants, would have cost 4s. 6d. At York the bag was lost. A verdict was found for the plaintiff for £15, with leave to move to increase it to £65, if under the circumstances the court should think him entitled to recover in respect of the £50 note. A rule *nisi* was obtained, which was subsequently discharged, all the judges concurring in the opinion that the loss was occasioned by the plaintiff's own misfeasance, and that by his omission to deliver the parcel to the defendants, they were discharged. The case of *The East India Company* v. *Pullen, Str.* 690, also it is supposed is decisive of this case. There the goods of the company were put into a lighter, and after the lading was taken in, a lock was put upon the hatches by a servant of the company, who went with the goods to see them safely delivered at the warehouse; a part of the goods were lost, and it was holden that the goods were not to be considered as ever having been in the possession of the carrier, but as being in the possession of the company's servant, and that therefore the carrier was not liable. So here the packages of money cannot be considered as ever having been in the possession of the master of the boat; they remained in the possession of Phillips and under his immediate care, as much so as the goods of a guest at an inn are in his own care, when he has taken the key of his room, in which case the inkeeper is not liable. *Jeremy on Car.* 150.

*In reply, on the part of the plaintiffs*, it was said that the admission by the defendants' counsel that the defendants were common carriers of the baggage of the traveller, although no distinct price was paid for it, other than what was included in the fare of the passengers, appeared to the plaintiffs' counsel to yield the cause; for if the defendants were to be considered as common carriers of such baggage, then upon every

principle of law applicable to this subject, and even accord-ing to the leading case relied on by the other side, that of *Gibbon* v. *Paynton*, 4 *Burr.* 2301, the carrier is liable to the full value of such baggage, unless he has given notice limit-ing his responsibility to a certain sum except where insur-ance is paid. This view of the question disposes of all the objections in reference to information of value, and the suf-ficiency of such information, for *cui bono* is it to be given ; if it is to have no effect upon the charge to be made for trans-portation, or upon the liability of the carrier ? That the carrier is liable to any amount which may be lost, unless he himself has limited his responsibility by notice, is an inevit-able consequence, unless the distinction raised by the coun-sel, that the baggage of the traveller must be confined to his ordinary wearing apparel, and such articles as are usually carried by him, can be maintained. Such distinction has, as yet, never been recognized, and to adopt it, would be the introduction of a new principle into the law of common car-riers, by which the inquiry in these cases would no longer be, what was the value of the property entrusted to the car-rier, but was it wearing apparel, and that suitable to the sta-tion and condition in life of the traveller ? At all events, the principal reason assigned in favor of the rule will not war-rant its adoption, viz. that the reward should be proportion-ate to the risk, for, scarcely in any case but the risk would be entirely disproportionate to the reward, and sometimes the wearing apparel and paraphernalia of a female traveller might exceed the amount of the loss in this case. Besides, why make a distinction in responsibility in this particular between an inn-keeper and the owners of a steamboat ? The traveller is equally the guest of each, and if the liability of one is to be limited to the wearing apparel of the travel-ler, so also must the liability of the other be limited. In the case of *Brooks* v. *Pickwick*, 4 *Bingham*, 218, the carrier was held responsible not only for the *clothes* but the *jewels* of a la-dy returning from an excursion to a fashionable watering place in England.

They further insisted that no contract was necessary to be proved, that the action was for a breach of duty, and was properly brought in the name of the owners for a loss of prop-erty entrusted by their agent to the agent of the defendants

2 *Starkie's R.* 74, 2 *Shower,* 81, 128, *Cro. Jac.* 224 ; that the circumstances under which the duty accrued were sufficiently stated in the declaration, and were fully supported by the proof ; and although it might be true, as contended on the other side, that two causes of action would thus grow out of the same transaction, the fact that such might be the case afforded no protection to the defendants, who are responsible to every person who has sustained injury by their negligence or breach of duty. There was not an iota of proof in the case to warrant the position taken on the other side, that Phillips himself was a *carrier* within the meaning of the law on this subject ; he was not a *common carrier,* whose business it was to carry money for all persons indiscriminately ; he was the *friend* of the plaintiffs, who took the place of an express messenger, and in the eye of the law in reference to the money entrusted to him, as it regards third persons, was the servant of the plaintiffs. Nor is there any foundation for the argument that the money was lost through his misconduct ; he was directed to deliver it to the master of the boat, and did as he was directed ; he put his trunk containing the money in the immediate charge of the master, and deposited it in his private office instead of having it stowed away among the ordinary baggage of the passengers. He told him it was a trunk of importance, and evinced unusual solicitude for its safety. What more could he have done ? He did not do as did the plaintiff in the case of *Miles* v. *Cattle,* 6 *Bingham,* 743, keep the money in his own charge, and thus *defraud* the defendants of the compensation which they otherwise would have received, for there was no charge for baggage, no *extra price* for valuables carried beyond a certain amount. Nor is this case like that of *The East India Company* v. *Pullen, Str.* 690, nor like the case in *Jeremy,* 150, where the guest took the key of his own room ; for, to assimilate them, it should have appeared that after depositing the trunk in the master's office, Phillips locked the door and took the key.

As to the objection that the defendants were not *common carriers* of *money,* the plaintiffs' counsel referred to their opening argument.

*By the Court,* NELSON, J.　This case is peculiar in many of its features, and must be determined by a recurrence to some of the general and fundamental principles which govern actions of this kind.　The rule of the common law in relation to common carriers has been frequently pronounced a rigorous one, and its vindication by Lord Holt affords abundant evidence, if any were wanting, of the truth of the observation.　He says, in *Lane* v. *Colton,* 1 *Vin. Abr.* 219, though one may think it a hard case, that a poor carrier that is robbed on the road without any manner of default in him, should be answerable for all the goods he takes, yet the inconveniency would be far more intolerable if it were not so, for it would be in his power to combine with robbers, or to pretend a robbery or some other accident, without a possibility of remedy to the party, and the law will not expose him to so great a temptation.　This reason, which I believe is the only one that has ever been given for the origin of the rule, and which probably had much foundation in fact in the early and rude age in which it must have been established, it is obvious at this day, is nearly as applicable to every person entrusted with the property of another as it is to the common carrier.　In proportion, however, to the rigor of the liability, was exacted the compensation for it and the means of enforcing payment, which affords a sort of equivalent for the harshness of the rule. Accordingly we find it frequently laid down in actions of this kind as a fundamental proposition, that the common carrier is liable in respect to his reward, and that the compensation should be in proportion to the risk.　So strictly was this rule adhered to, that it was repeatedly decided by Lord Holt that the hackney coachman was not liable for the travelling trunk of the passenger which was lost, unless a distinct price had been paid for the trunk as well as for the person ; and that where it was the custom of the stage coach for passengers to pay for baggage above a certain weight, the coachman was responsible only for the loss of goods beyond such weight. 1 *Vin. Abr.* 220, *and cases there cited.*　So, in the analogous case of the innkeeper, if a guest stops at an inn, and departs for a few days leaving his goods, if they are stolen during his absence, the landlord is not liable as innkeeper ; for, at the

time of the loss, the owner was not his guest, and he had no benefit from the keeping of the goods. *Cro. Jac.* 188. 1 *Vin. Abr.* 225. It has since been determined that the stage coachman is responsible for the baggage of the passenger, though no distinct price was paid for it ; upon the ground, however, still consistent with the principle of the above cases, to wit, that the reward for carrying the same was included in the fare for the passenger. 1 *Wheaton's Selwyn*, 301, *n.* 1.

Now, upon the ground that the defendants in this case have received no compensation or reward from the plaintiffs or any other person for the transportation or risk of the *money* in question, and that they were deprived of such reward by the unfair dealing of the agent of the plaintiffs with the defendants, I am of opinion the plaintiffs cannot recover, and that they were properly nonsuited upon the trial. As a general rule, where there has been no qualified acceptance of goods by special agreement, or where an agreement cannot be inferred from notice, the carrier is bound to make inquiry as to the value of the box or article received, and the owner must answer truly at his peril ; and if such inquiries are not made, and it is received at such price for transportation as is asked with reference to its bulk, weight or external appearance, the carrier is responsible for the loss, whatever may be its value. If he has given general notice that he will not be liable over a certain amount, unless the value is made known to him at the time of delivery and a premium for insurance paid, such notice, if brought home to the knowledge of the owner, (and courts and juries are liberal in inferring such knowledge from the publication of the notice,) is as effectual in qualifying the acceptance of the goods as a special agreement, and the owner at his peril must disclose the value, and pay the premium. The carrier in such case is not bound to make the inquiry, and if the owner omits to make known the value, and does not therefore pay the premium at the time of the delivery, it is considered as dealing unfairly with the carrier, and he is liable only to the amount mentioned in his notice, or not at all, according to the terms of his notice. 1 *Wheat. Sel.* 305, 6, 8, *and notes.* 6 *Com. Law R.* 333. 4 *Burr.* 2298. 5 *Com. L. R.* 476. 8 *Pick.* 182. 11 *Com. L. R.* 243.

In this case no notice has been given by the defendants limiting their responsibility, and they are no doubt liable to the full value of the baggage of the passenger lost, or of the goods lost, which they have received without any special agreement qualifying the risk for transportation. The defendants cannot succeed upon this ground. But in the absence of notice, if any means are used to conceal the value of the article, and thereby the owner avoids paying a reasonable compensation for the risk, this unfairness and its consequence to the defendants, upon the principles of common justice as well as those peculiar to this action, will exempt them from the responsibility; for such a result is alike due to the defendants, who have received no reward for the risk, and to the party who has been the cause of it by means of disingenuous and unfair dealing. Thus, where the plaintiff delivered to the carrier a box, telling him there was a book and tobacco in it, when it contained £100, and it was lost, he should not recover. It is true that in such a case a party did recover, though Rolle, Ch. J. considered it a cheat; but it is clear that at this day he could not recover. 4 *Burr.* 2301. So where a box in which there was a large sum of money was brought to a carrier, who inquired its contents, and was answered it was filled with silk, upon which it was taken and lost, it was held the owner could not recover. *Ibid.* So where a bag sealed was delivered to a carrier, and was said to contain £200, and a receipt was given for the same, when in fact it contained £400, and it was lost, the carrier was held answerable only for the £200, as the reward extended no farther. 4 *Burr.* 2301. *Selw.* 305, *n.* These cases all proceed upon the ground that the carrier is deprived of his reward for the extra value of the article, and consequent extra risk incurred, by means of the unfair if not fraudulent conduct of the owner; and therefore the rigor of the common law rule is not applied to him, and he is only held responsible for the loss in case of gross negligence. If the defendants are to be made responsible to the plaintiffs through the medium and acts of their agent, who was employed to carry the money from New-York to the bank, the plaintiffs also must be held responsible to the defendant for his conduct; the obligation

must be reciprocal. Instead of committing the several packages of money to the captain, which of themselves generally indicate their value, and in this case would have done so, as the figures (by which I understand the quantity of money in each package) could be seen upon them, and thereby enable the captain to exact a reasonable compensation for the risk, and apprise him of the necessity of greater care and caution in the safe conveyance of the money, which he naturally would bestow in proportion to the value, the agent of the plaintiffs put them into his trunk and committed it to the captain as his baggage, affording no other indication of the value of its contents than that it was a trunk of importance. This was enough to attract the attention of the felon who might be standing by to its contents, but certainly was not calculated to afford information to the captain of the extraordinary character and value of those contents. The captain might understand he had a costly wardrobe and other necessaries and conveniences for travelling of great value, but not that the trunk contained $11,000 in bank bills, which the traveller was carrying for hire or friendship, and not as travelling expenses.

It may be difficult to define with technical precision what may legitimately be included in the term *baggage*, as used in connection with travelling in public conveyances : but it may be safely asserted that money, except what may be carried for the expenses of travelling, is not thus included, and especially a sum like the present, which was taken for the mere purpose of transportation. We have already seen, that formerly so strictly was the rule that the carrier was liable only in respect to the reward adhered to, that he was not held liable for the loss of the baggage of the passenger unless a distinct price was paid for it. The law is now very properly altered, as a reasonable amount of baggage, by custom or the courtesy of the carrier, is considered as included in the fare for the person ; but courts ought not to permit this gratuity or custom to be abused, and under pretence of baggage to include articles not within the sense or meaning of the term, or within the object or intent of the indulgence of the carrier, and thereby defraud him of his just compensation, and subject him to

unknown and illimitable hazards. If the amount of money in the trunk in this case is not fairly included under the term *baggage*, as used in the connection we here find it, (and I cannot think it is,) then the conduct of the agent was a virtual concealment of that sum; his representation of his trunk and the contents as baggage was not a fair one, and was calculated to deceive the captain—and it would be a violation of first principles to permit the plaintiffs to recover. The case of *Miles* v. *Cattle et al.* 19 *Com. L. R.* 219, in some respects resembles this case. The plaintiff was going to L., and took a seat in a public conveyance. He had with him a bag labelled "T. Miles, traveller," containing clothes worth about £15. Before he started, G. delivered him a parcel containing a £50 bank note addressed to an attorney in L., which the plaintiff was desired to book at the defendants' office, and to be forwarded by the defendants to L. The plaintiff, instead of doing so, put the parcel in his own bag, intending to convey it to L. himself. If the parcel had been sent by the defendants, it would have cost 4s. 6d. The bag and contents were lost. The verdict was found for the £15, with leave to apply to increase it, on the facts in the case, by adding the $50. The court denied the application, principally upon the ground that the plaintiff had no interest in the £50. But it was conceded by the court that the owner could not recover on the facts. Tindal, J. says, in violation of his trust, the plaintiff thought proper not to deliver the parcel to the defendants, but to deposit it in his own bag; thereby depriving the owner of any remedy he might have had against the defendants, and the defendants of the sum they would otherwise have earned for the carriage of the parcel. In this case the president of the bank directed Phillips to commit the packages directly to the captain, and had he followed such directions, the captain would have been enabled to charge a reward for the carriage of the same, and the captain, or the defendants would have been responsible for its safety. His omission to follow the directions was a violation of his trust, for which the defendants are not accountable.

It was decided in *Sewall* v. *Allen et al.* in the court of errors, 6 *Wendell*, 335, that the Dutchess and Orange Steam-

Boat Company, and the members thereof, were not liable for the loss of packages of bank bills entrusted to the captain of the boat, on the ground that the carriage of bank bills was not within the ordinary business of the company, and so far as the usage extended, it was a personal trust committed to the captain, who alone received the compensation, or in other words, the company were neither by their charter or usage under it, common carriers of bank bills. From the facts appearing in that case, I presume the principle here decided by the highest judicial tribunal in the state, would be equally applicable to this company, though from the direction the cause took upon the trial, facts sufficient do not appear to raise the question. If so, it seems to me impossible to maintain the proposition that the defendants would be holden responsible for the loss of an article in the trunk of a passenger, which in no sense of the term can be considered a part of the baggage of the passenger, and for the transportation of which no compensation is received by the company, when confessedly they would not be accountable for the same article, if it had been committed directly to the care of the captain, and a reasonable reward paid him for transportation. If it is said the difference between the cases consists in this, that in the one case it is a part of the baggage of the passenger, the carrying of which is within the ordinary business of the company, and for which they receive the reward, and in the other, it is a private transaction between the owner and the captain; the answer, I think is, that putting the article in the trunk, does not make it baggage. If it is included within that term, it is as much baggage when distinctly committed to the care of the captain as when in the trunk; the place in which it is, cannot in this instance, at least, vary the character of the article, or the transaction: the object is the transportation of the money, without reference to a connection with the person of the passenger.

Having come to the conclusion upon what I view as the merits and principle of the case, that the plaintiffs cannot recover, it is unimportant to examine any other question discussed upon the argument.

<div align="center">

**Motion for new trial denied.**